IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE BOEING COMPANY, | § | |
| | § | No. 5, 2018 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. N14C-12-055 |
| SPIRIT AEROSYSTEMS, INC. | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: June 13, 2018
Decided: July 12, 2018

Before **VALIHURA**, **VAUGHN** and **TRAYNOR**, Justices.

## O R D E R

(1)   Boeing, which designs and manufactures aircraft, sold a few of its manufacturing facilities to Spirit Aerosystems. Spirit anticipated offering jobs to some of the Boeing employees, so the two companies explored how to allocate responsibility for the benefits those employees had accrued during their time with Boeing.

(2)   The solution they arrived at is embodied in the purchase agreement, which provides that Spirit would, at the time of closing, assume the "[l]iabilities for pension Liability, Accrued Vacation, retiree medical, flexible spending accounts, sick leave, and personal time, to the extent provided in Section 6.2" of the

agreement.[1] Section 6.2, in turn, provides that while the "compensation and levels of benefits" that the Boeing employees would receive would be at Spirit's discretion, Spirit would "credit periods of service prior to the Closing for purposes of determining eligibility (and benefit entitlement with respect to vacations and pension benefits . . . )" under Spirit's own benefit plans.[2] Spirit also agreed that for those Boeing employees who were either covered by a collective bargaining agreement (CBA) while at Boeing or entitled to a Boeing non-union pension plan, Spirit would ensure that they were covered by defined benefit pension plans that would "include credit for [their] past service with [Boeing] for eligibility and vesting and . . . early retirement benefits and benefit accrual previously recognized under [Boeing's] Pension Plans."[3]

(3)     The parties agreed that as a result of this arrangement, Spirit's pension plans would be "liable for benefits with respect to service recognized under [Boeing's] Pension Plans on or prior to the Closing Date," and Boeing would not have "any further responsibility with respect to the . . . Liabilities so transferred."[4] And as part of the purchase agreement, Spirit agreed that it would indemnify Boeing

---

[1]     App. to Opening Br. A379.
[2]     *Id.* at A426.
[3]     *Id.* at A428.
[4]     *Id.*

for any losses "in connection with or arising from" any of the liabilities Spirit took on.[5]

(4)     After the parties executed the purchase agreement, Boeing announced that it would deem any employees taking positions with Spirit to have been "terminated due to divestiture." Some of Boeing's CBA-covered employees cried foul, arguing that under their respective CBAs, their separation from Boeing constituted a "layoff," not a "termination." The reason for their protest had to do with a perk in Boeing's benefit plans: under the plans, if an employee over the age of 49 (with sufficient seniority at Boeing) were to be laid off, the employee is entitled to a "layoff bridge," which includes special early pension and medical retirement benefits. The same, of course, is not true if the employee were to be terminated.

(5)     Boeing and its CBA-covered employees fought over the issue in multiple forums for a number of years. Boeing eventually lost one of the suits and settled another; all told, the company says it is on the hook for approximately $150 million in contract damages, measured by reference to the lost benefits to which the CBA-covered employees would have been entitled had Boeing not breached the CBAs.

---

[5]     *Id.* at A449.

(6)     Boeing believes that under their purchase agreement, this expense belongs to Spirit and that it is entitled to be indemnified. The Superior Court, based on its interpretation of the agreement, disagreed.

(7)     The two sides spent much time before the Superior Court (and us) arguing over the significance of the fact that this expense arose out of a breach of Boeing's CBAs. Spirit believes that fact is dispositive of the case because, under its interpretation of the purchase agreement, it had no responsibility to take on any of Boeing's CBA obligations. But Boeing—in addition to questioning some of the interpretive moves that Spirit made—pointed out that Spirit's flat disclaimer of any responsibility for CBA-based liabilities runs counter to its concession that the purchase agreement requires it to fully assume Boeing's liability for any vacation or sick leave that any of the ex-Boeing employees had accrued. Those vacation and sick leave benefits, Boeing pointed out, were (at least for the union employees) creatures of Boeing's CBAs, so it could not be the case that the purchase agreement granted Spirit categorical immunity from all CBA-based liability.

(8)     The Superior Court seems to have largely agreed with Spirit's interpretation. But we agree with Boeing that the source of the employees' entitlement to the benefits—the CBAs—is not dispositive of who must pay for them. Spirit agreed to assume liability for pension and retiree medical benefits "to the

4

extent provided in Section 6.2" of the purchase agreement, and the answer to who must bear the expense lies in the text of that provision.

(9)   It is here that we agree with the Superior Court's key observation that under section 6.2, Spirit did not agree to directly assume Boeing's liability for pension and retiree medical benefits, but rather agreed only to credit the Boeing employees' past service with Boeing for the purpose of determining their eligibility for benefits—including early retirement benefits—under Spirit's own benefit plans. That distinction, we think, disposes of Boeing's claim for indemnification.

(10)   Taking the pension benefits first, Spirit's promise to "credit" the Boeing employees "for [their] past service with [Boeing] for eligibility and vesting and . . . early retirement benefits and benefit accrual previously recognized under [Boeing's] Pension Plans"[6] was a promise to treat the incoming Boeing employees like their equivalently-tenured Spirit peers under Spirit's own benefit plans and recognize the early retirement benefits they had accrued at Boeing in the event that Spirit were to lay them off. But the employees were laid off by Boeing, not Spirit, before they began working at Spirit and participating in Spirit's benefit plans, so Boeing's layoff did not trigger any liability under Spirit's benefit plans. And under the terms of the purchase agreement, Spirit's pension liability extends no further. Boeing makes much of Spirit's promise that Boeing would not "have any further responsibility with

---

[6]   *Id.* at A428.

respect to the Liabilities so transferred,"[7] which Boeing reads as a blanket indemnification agreement for all pension liability. But that promise applies only to the "Liabilities so transferred," not all pension liabilities, and as we explained, the only pension liabilities transferred were the Boeing employees' seniority rights.

(11)   The same is true for the early retiree medical benefits. As with the pension benefits, Spirit did not agree to directly assume Boeing's liability to the ex-Boeing employees. Rather, Spirit agreed, in section 6.2(g) of the purchase agreement (the subsection dealing specifically with retiree medical benefits), only to "maintain retiree medical coverage" for them and "provide each such [employee] full credit for periods of service prior to the Closing for all purposes thereunder."[8]

(12)   Boeing disagrees with this reading of section 6.2(g), pointing to the penultimate sentence of the subsection, which states that "[Spirit] agrees that [Boeing] and its retiree medical plans shall have no further responsibilities after the Closing Date to provide to such [ex-Boeing employees] retiree medical benefits."[9] Boeing says that sentence shows—at least with respect to retiree medical benefits— that Spirit agreed to assume the full extent of Boeing's liability to the ex-Boeing employees, not just credit them for their Boeing seniority.

---

[7]   *Id.*
[8]   *Id.* at A429.
[9]   *Id.*

(13)   Boeing, in effect, urges us to read section 6.2(g) the same as sections 6.2(d) and (e), which deal with accrued vacation and sick leave. Spirit admits that those provisions require it to fully assume Boeing's liability for those benefits, not just provide the ex-Boeing employees with credit for their seniority under Spirit's own benefit plans. But there are important differences between those provisions and section 6.2(g) that convince us that Boeing is not correct to group them together. Sections 6.2(d) and (e) require Spirit to "assume all Liability" for the employees' vacation and sick leave benefits and "indemnify, hold harmless, and . . . defend [Boeing] from any Liability . . . arising from" those benefits, while section 6.2(g), as we said, requires Spirit to only "maintain retiree medical coverage" for the ex-Boeing employees and provide them with "full credit" for their Boeing service.[10]

(14)   But perhaps most telling is the difference in the ways that these provisions deal with the possibility that Spirit's benefit plans could offer benefits at levels lower than the ex-Boeing employees had been promised under Boeing's plans. Under the accrued vacation provision, Spirit promised that if its benefit plans did not allow the ex-Boeing employees to use all of their accrued vacation, Spirit would cash them out for any balance to ensure they would receive the full measure of benefits Boeing had promised. And under the sick leave provision, Spirit likewise promised that if it were to modify its sick leave policy in a way that would leave the

---

[10]      *Id.* at A427.

ex-Boeing employees worse off than they had been under Boeing's plans, Spirit would cash them out for "not less than the amount they would have been entitled to as of the Closing Date."[11] Both of those provisions, then, are consistent with Spirit's admission that it agreed to fully assume Boeing's liability for accrued vacation and sick leave. But section 6.2(g)—which expressly provides that it "does not limit [Spirit's] ability to make changes in or amendments to any [of its] retiree medical plan[s] following the closing"—does not contain any corresponding obligation to make the ex-Boeing employees whole in the event that Spirit's plans were to offer lower benefits than Boeing's.[12] That, to us, confirms that Spirit's obligation was only to credit the ex-Boeing employees for their seniority under Spirit's plans, not to assume all of Boeing's liability.

(15) With that context in mind, we do not agree with Boeing that the penultimate sentence of section 6.2(g)—which provides that Spirit agreed "that [Boeing] and its retiree medical plans shall have no further responsibilities after the Closing Date to provide . . . retiree medical benefits"—rewrites section 6.2(g) into a broad indemnification agreement in the style of sections 6.2(d) and (e). In our view, that passage simply confirms that once the Boeing employees began working at Spirit—and once Spirit, consistent with its obligations under section 6.2(g), provided

---

[11]     *Id.*
[12]     *Id.* at A429.

"retiree medical coverage for the[ir] benefit" under its own plans—Boeing had no liability for any benefits they might be entitled to receive under those plans.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court, including its award of fees and costs, be AFFIRMED.

BY THE COURT:

/s/ Gary F. Traynor
Justice